Filed 8/16/22 Zachary S. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ZACHARY S., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F084362 <br><br> (Super. Ct. Nos. JVDP-20-000137, JVDP-20-000138, JVDP-20-000139) <br><br><br> **OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review. Annette Rees, Judge.

Jill Smith for Petitioner.

No appearance for Respondent.

---

[*] Before Smith, Acting P. J., Meehan, J. and Snauffer, J.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

Petitioner Zachary S. (father), through counsel, seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) from the juvenile court's orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22)[1] on May 6, 2022, terminating reunification services and setting a section 366.26 hearing on September 6, 2022, as to the children, Z.S, M.S., and I.S. The petition contends the juvenile court erred by finding that return of the children to father's care would create a substantial risk of detriment and that the Stanislaus County Community Services Agency (agency) provided reasonable services. Father also argues that the juvenile court erred in failing to continue father's reunification services to the 24-month review date.

## FACTUAL AND PROCEDURAL SUMMARY

*Initial Removal*

In June 2020, the agency received an emergency response referral after law enforcement responded to a domestic violence incident between father and the children's mother, L.W. (mother). Mother claimed father punched her left eye and hit her in the face with a backpack weighing approximately 15 pounds. Father also ripped out mother's hair, and law enforcement observed mother to be bald from her hairline to the middle of her head. Both parents were drinking alcohol at the time of the incident and the children were present. Mother disclosed two prior domestic violence incidents where she and father were each arrested on different occasions. Father fled the scene before law enforcement arrived, and mother denied an emergency protective order. Mother did not have a plan regarding her relationship with father.

---

[1]     Statutory references are to the Welfare and Institutions Code.

The agency provided voluntary family maintenance services to mother and father from October 2019 to April 2020. The voluntary case was a result of mother testing positive for alcohol and THC at the time of I.S.'s birth, an unstable living arrangement, and suspected domestic violence. The parents' voluntary family maintenance case was closed due to their refusing services. In addition to his prior arrest for domestic violence, father had a prior conviction for driving under the influence of alcohol. The agency was unable to locate father due to his homelessness, and mother was unable to provide any contact information for father.

On July 14, 2020, the children were taken into protective custody. The agency filed an original petition alleging the children were described by section 300, subdivisions (b)(1) and (g). The petition alleged that the children were at substantial risk of suffering serious physical harm as a result of the parents' domestic violence and substance abuse. It further alleged that father's whereabouts remained unknown. On July 17, 2020, the juvenile court conducted a detention hearing where it ordered the children detained, and it set a jurisdiction and disposition hearing for August 17, 2020.

*Jurisdiction and Disposition*

The agency's report on jurisdiction and disposition recommended that the allegations in the petition be found true and family reunification services be provided to mother and father. The report detailed a previous referral related to mother's substance abuse during her pregnancy with M.S. It also described reports that mother had unstable housing, tested positive for drugs, and appeared under the influence of alcohol for an assessment during her voluntary family maintenance case.

Father was located by the agency, and he wanted to make changes to be better for the children and mother. Father explained that he had no prior work experience, and he had mental health conditions of attention deficit hyperactive disorder (ADHD) and schizophrenia since he was five years old. Mother disclosed having mental health issues

3.

since her second child was born, and she had an older daughter in the care of a paternal relative. Mother began using marijuana and alcohol when she was 17 years old.

The agency provided father with referrals for domestic violence offender counseling, individual counseling, couple's counseling, parenting education, and residential drug treatment. Father reported he was seen at Valley Mountain Regional Center (VMRC) for mental health and medication updates to address anxiety and sleeping problems. Father was attending supervised visits with the children regularly.

The children were placed together in a foster home, but a concurrent home had not been identified for the children. I.S., at nine months of age, and M.S., at two years of age, were diagnosed with sickle cell anemia at birth, and they received treatment at Valley Children's Hospital. Z.S., at three years of age, was on track developmentally without any noted medical concerns. The agency made contact with relatives, who were interested in placement of the children. Mother expressed her desire that the children not be placed with relatives.

On August 25, 2020, the juvenile court found the section 300, subdivision (b)(1) allegation of the petition true, and it continued the disposition hearing to August 28, 2020. At the continued disposition hearing, the juvenile court removed the children from mother and father's custody and ordered mother and father to participate in reunification services as described in the case plan.

The objectives of father's case plan included expressing anger appropriately, living free from alcohol dependency, maintaining suitable housing, and not involving his children in attempts to control or intimidate his partner. The responsibilities of father's case plan required him to sign releases of information to allow the agency to communicate with his treating physicians to confirm his mental health and medical status. Father was also required to attend any recommended mental health services, domestic violence counseling, individual counseling, couples counseling, a parenting program, recommended substance abuse treatment, and random drug testing.

4.

*Family Reunification Period*

The six-month review report, filed on February 4, 2021, recommended that family reunification services continue for mother and father. The children were moved to another foster home in January 2021. Mother resided in a sober living environment while she was seven months pregnant. Mother was discharged from the program due to a positive alcohol test, but she was readmitted the following week. She was engaging in all of her services and securing a close support group. Father continued to reside in a residential drug treatment program and was making slow progress in his services. Father presented as frustrated because he was worrying about mother's progress instead of focusing on his own services.

Mother and father failed to follow through on a referral for I.S. to be evaluated by a dietician, and I.S. was hospitalized for severe malnourishment in November 2020. The parents had been previously advised to place I.S. on a high calorie diet prior to the children's removal. Father did not ask about the health of I.S. while he was hospitalized, and he had a hard time understanding how his children's exposure to domestic violence put them at risk of psychological trauma. Father was receiving VMRC services and had diagnoses of schizophrenia, ADHD, bipolar, and insomnia. Both mother and father were working together despite their extensive domestic violence history and hoped to reunify as a family. The amended case plan added codependency with mother as an issue of focus during father's individual counseling. On March 12, 2021, the juvenile court adopted the agency's recommendation to continue reunification services to the parents after the parties resolved a potential contest to the recommendation.

The agency's report prepared for the 12-month review hearing, filed on August 5, 2021, recommended that reunification services be continued for mother and father. The agency also requested continued authorization to begin "daylong visits and overnight visits leading to [trial] visits once deemed appropriate." Both parents continued to reside in their respective treatment facilities. Mother's parent partner noted mother's tendency

5.

to enable father by resolving issues for him. A dependency case was initiated for the parents' newborn child in March 2021, and the child remained in mother's care.

Father presented as frustrated, entitled, and unwilling to receive feedback from facility staff, and he was moved between two different homes in the facility as a result of his attitude. Despite his progress, father was bothered by the house rules and constantly complained about having to share a room. Father continued to submit negative drug test results. Mother did not believe father could handle all of the children at the same time when community visits were being scheduled in May 2021. Father was struggling with the children and appeared frustrated when he had the children in his care. Father often relied on mother to resolve his problems and he did not appear interested in learning how to care for the children. Instead, father stated that he will provide for his family while mother cared for the children.

The social worker acknowledged father's "good" progress, but did not believe he demonstrated the skills he learned during the reporting period. Father regularly attended individual counseling, but the clinician noted father's statement that he was "somewhat dependent" on mother. The parenting education component of father's case plan was complete except for child-parent labs. Father successfully completed a transitional living program for his substance abuse treatment, and he was in the facility's sober living program.

Father's accountability became an issue during the reporting period as he minimized issues raised by the manager of his sober living program, and he was not able to share what he was learning in his parenting classes. In April 2021, mother and father were observed to be fighting and irritated with each other during a visit with the children. A case manager with VMRC shared that father had diagnoses of mild intellectual disability and an inattentive type of ADHD. VMRC provided father with transportation to work, supported living services, and "tele psych" for ongoing care.

Father began community visits with the children at his sober living program in May 2021. Father became upset when the children's care provider did not provide extra clothes, diapers, and wipes during visits. However, the social worker had advised father to obtain these items prior to visits beginning at his home. A parent partner offered to assist father in purchasing these items, but father did not make himself available because he had "other things to do." Father told the parent partner that he did not have anything in his home for the children because they did not live with him.

During a visit at father's residence, the parent partner discovered that father left the children's infant sibling unattended in the kitchen while he played outside with the children. Father had canned sausages, toaster pastries, and cookies available as food for the children, and the children ate four cans of sausages during one visit in July 2021. Mother eventually provided father with a box of clothes, diapers, and wipes for his visits with the children. The social worker noted that father did not appear to know how to feed or engage with the children for long periods of time once full day visits began.

The agency did not believe father was able to demonstrate his ability to provide for and keep the children safe in the community despite the assistance he received from his parent partner, VMRC, and other service providers. There also remained concerns that mother enabled father by preventing him from providing for the children on his own. Father still relied on mother to solve his problems and manage his finances.

The children's placement was changed again due to their previous care provider physically disciplining the children and leaving bruises. However, it was reported that the children were thriving with their current care providers. M.S. and I.S. were medically fragile and required structure due to their medications and appointments with multiple specialists and pediatricians. I.S. was making progress in his weight gain and growth.

The 12-month review hearing was held on August 19, 2021, and father failed to appear. The juvenile court found that the agency provided reasonable services to mother

7.

and father, continued reunification services to both parents, and set an 18-month review hearing for January 10, 2022.

The agency recommended that the children be returned to the custody of mother and father with court-ordered family maintenance services in its report for the 18-month review hearing, filed on December 22, 2021. Mother and father continued to reside in their respective sober living facilities. The children were participating in overnight visits with father on Friday nights and mother on Saturday nights. A trial visit was scheduled to begin on December 31, 2021, where mother would have the children Monday through Friday and father would have the children during the weekend until the family had permanent housing to live together.

Father made progress both in his services and in caring for the children on his own. However, father still struggled with allowing the sober living program's staff to check on the children and provide guidance on a meal plan for the children. Father was upset that the agency did not recommend dismissal of dependency. The agency did not believe dismissal was appropriate due to the agency's inability to assess the family as a single unit.

Z.S., at five years of age, was attending kindergarten and was on track developmentally without any need for mental health services. M.S., at four years of age, was still medically fragile, took multiple medications each day, and received speech therapy and developmental skill services through VMRC. I.S., at one year of age, was also medically fragile with multiple medications each day, but he was on track developmentally.

Both parents completed 10 sessions of couples counseling with a plan to stop until mother and father moved in together. Father had completed a total of 27 individual counseling sessions and all of his required parenting classes. Staff at father's program had contacted the social worker over concerns that father left the children unattended while he smoked outside in September 2021.

8.

On December 13, 2021, a child and family team meeting was held where it was decided that family maintenance services would be provided to allow the agency to assess the family as they moved in together and assist the family with first month's rent and a deposit. Both mother and father agreed to submit to a hair follicle test. Father completed the hair follicle test with negative results, but mother was unable to complete the hair follicle test because of the texture of her hair.

On December 29, 2021, the agency submitted the results of mother's drug test from December 13, 2021, which revealed a positive result for alcohol. The juvenile court continued the 18-month review hearing for the agency to file an updated report. The agency filed an addendum report on January 19, 2022, which recommended that both mother and father's reunification services be terminated and a section 366.26 hearing be set. The report described how mother provided a positive drug test result for alcohol on December 13, 2021. The agency received the results of the drug test on December 28, 2021. Mother denied alcohol use when confronted with the positive alcohol result. Staff at mother's sober living facility asked mother and her roommate to complete a test, and the result of both tests were also positive for alcohol. Mother was allowed to remain at the facility until a new hair follicle test was conducted on December 29, 2021.

The agency received the results of the hair follicle test on January 10, 2022, which was positive for methamphetamine. Two subsequent tests from mother's sober living facility on December 30, 2022, and December 31, 2022, were also positive for alcohol. Mother eventually admitted that she had consumed alcohol, but her story changed from twice to four or five times while the children were with father. When mother began living on her own in the treatment program's "[g]rad [h]ouse," she stopped taking her medication without consulting her physician. After her relapse, mother moved back into her treatment program's sober living home.

Father was unable to tell the agency's social work supervisor if he was ready to parent the children on his own. Father stated how he needed to support mother and he

9.

did not see himself parenting alone. Father denied any knowledge of mother's alcohol use, and he did not believe mother was a " 'meth person.' " Father told the social worker that he did not have a problem with mother's drinking because his concern was the agency not providing his family a home. A staff member from an organization working with mother since November 2021 to find housing explained that the parents were provided with all of the services to find housing, but mother and father had not found a house that they liked.

The agency's assessment explained its belief that father continued to be codependent with mother and relied on her to bring food, clothes, and diapers to the children while they were in his care. Father interfered in mother's treatment when she had issues with sobriety by requesting new tests and calling mother repeatedly while she was on "blackout" and unable to answer phone calls. The agency did not believe that father made progress in his codependency with mother, and it claimed father put mother before his children. This dependency was said to prevent him from growing and making progress in learning how to properly care for the children on his own. Staff at mother's drug treatment program indicated that father appeared to be "obsessed" with mother.

In a conversation with the social worker on January 19, 2022, father shared his plans to work in the evening while mother worked during the day. Father explained that he would either pay a cab or have mother take the children to their medical appointments because she was the only one with a driver's license. Father asked if the social worker could put father in a house when he was told the agency's reasons for changing its recommendation to terminate reunification services. Father stated that mother was in charge of finding them a home while he worked to give her money for their savings account. The social worker asked father if he would be able to keep the children safe if they were returned to him alone, and father responded, " '[y]ou are asking me a hard question, I don't know if I can do that.' " Father then expressed that mother would be "ok" and his family would be together.

10.

In preparation for a contested 18-month review hearing, the agency submitted another addendum report, filed on March 2, 2022. The children's visitation with the parents returned to supervised and the first virtual and in-person visits were reported to go well. In February 2022, father's two-hour in-person visit was terminated 40 minutes early because father was unable to manage all of the children safely.

The visit was described as chaotic with the children running around the room and hanging on father. He buckled the baby onto the changing table and walked away. Father did not correct the children's behavior as they climbed over and under furniture, and multiple social workers intervened to control the children. Father cancelled a visit the following week because he had chores and "it was too much trouble." Mother was present during father's next supervised visit, and no major concerns were noted. A new parent partner was assigned in February 2022, and they helped mother and father understand what was required to obtain their voucher for housing.

Father continued to participate in individual counseling to focus on independent living and raising his children alone. Father told his counselor that he still gave most of his money to mother because she was the payee for his benefits, and he started to worry that she could have used his money to buy alcohol. His counselor was concerned if father was required to be the sole care provider for the children as there was no plan in place with a commitment from father's proposed care provider, his mother, to assist him in caring for the children.

After multiple continuances for various reasons, a contested 18-month review hearing began on March 10, 2022. Mother testified that she relapsed the weekend before her positive test on December 13, 2021, and she also drank on Christmas day. Mother considered her and father to be an intact couple and part of each other's support system. Mother was unable to describe how domestic violence had affected her children, and she did not believe that she was codependent with father. Mother testified that she would

establish boundaries if father had sole custody of the children by not answering his phone calls.

Father testified that he continued to reside in sober living at the same drug treatment program. Father's drug of choice was alcohol and he acknowledged that he was still recovering with more than 18 months of sobriety. Father began drinking at the age of 19, and he was currently 28 years old. Despite mother having relapses in October 2020 and December 2021, father had no concerns that she would be unable to maintain her sobriety. Mother and father were in a relationship for nine years, but he could not name any triggers that caused her to drink. Father acknowledged that anger and alcohol were triggers for their domestic violence. However, he was not concerned because he felt mother was "learning from the mistakes she had made."

Father maintained his position that he wanted to reunify as an intact family with mother. He believed mother's relapse was caused by the stress of her drug treatment program and not their children. Father did not notice that mother was stressed prior to her relapse, and he stated he was sometimes "clueless on certain things." When asked about his children's medical and developmental issues, father was unable to identify which child received VMRC services, and he was not aware of the names of their doctors or dates for appointments. Father would know the children's appointments once they were returned to his care, and he planned to use a rideshare service to transport the children to medical appointments at Valley Children's Hospital.

The assigned family reunification social worker testified that the agency was concerned with father feeding the children "hot Cheetos mac and cheese" for breakfast during visits. It was also a concern that mother was dropping food off for the children because she was not authorized to be present for the visits at his program. Father's inability to independently parent was demonstrated by his failure to appreciate the compromised immune system of his children with sickle cell anemia during the pandemic. The social worker justified the change in the agency's recommendation

12.

because the original plan was for the children to be returned with mother being the primary care provider of the children with father's assistance. The social worker did not believe father had the ability to parent the children on his own. The paternal grandmother could not be approved as a care provider for the children based upon her prior child welfare history.

The counselor that facilitated father's individual counseling testified that they were currently working on unhealthy lifestyle choices, codependency, domestic violence, and substance abuse. The counselor was concerned about father's judgment in identifying safe care providers and his plan to utilize his mother as a care provider. In the last two months, father claimed he started managing his own finances. Father denied having a codependent relationship during sessions. Mother's therapist also testified regarding her general counseling sessions.

A staff member from father's drug treatment program testified that father had recently improved his attendance of meetings and completion of chores. The staff member previously had to hover over father until he completed his work at the program. Father's last write-up for rule breaking was on March 23, 2022.

On April 27, 2022, father testified again on his own behalf as the hearing continued over several days. Father was still in a relationship with mother, and he did not believe he needed additional services. He testified that he would recognize if mother relapsed because it would be obvious. However, he observed mother pick up the children for a visit the day she relapsed in December 2021, without noticing signs of a relapse. Father intended to take an anger management class because he sometimes had an anger problem. He claimed that he never read his case plan or asked the social worker to explain his responsibilities under the case plan. The assigned social worker testified in rebuttal as to her efforts to go over father's case plan with him each month.

Father did not have a license due to a prior driving under the influence conviction, and he believed scheduling multiple rides through a service was overwhelming to him. If

13.

the children were returned to his care, then he would quit his job and support the children with public assistance and disability benefits.

Counsel for the agency argued that it had met its burden to prove that it would be detrimental to return the children to the care of their parents, and it also argued that there were no extraordinary circumstances justifying an extension of reunification services to either parent. Counsel for the children agreed with the agency's recommendation and joined in the argument of the agency's counsel.

Counsel for mother requested that the juvenile court either return the children to their care or extend mother's reunification services to the 24-month review period. Father's counsel argued that there was no evidence that the children would be at risk if returned to father's custody. His counsel also argued that reunification services should be continued for a hearing pursuant to section 366.25 based upon father's regular visitation, significant progress, and completion of a substance abuse program. Father's counsel raised no complaints in regards to the agency's provision of reasonable services during argument. After argument from counsel, the juvenile court continued the matter for ruling on May 6, 2022.

In its ruling, the juvenile court found the allegations of a supplemental petition for the children's infant sibling true. It identified the parents' issue of codependency as "a persistent and rigid emotional adherence to the parents' relationship over successful engagement and progress in their case plan." The juvenile court described how mother still struggled to maintain her sobriety, was unable to identify specific triggers, and was not honest with her program or social worker regarding her relapse. In relation to father, it acknowledged that father demonstrated his commitment to sobriety despite father's attitude towards some service providers in the beginning of the case. However, the juvenile court did not believe that father was capable of caring for all of the children at once without assistance. It concluded by discussing how father's only support person

14.

was his mother, who had a child welfare history with father as a victim, and it criticized father's failure to secure housing for the family despite assistance.

The juvenile court detailed the various services provided to father with consideration of his mild intellectual disability, and it found that the agency provided reasonable services. It concluded that it was not able to find that there was a substantial probability that the children would be returned to either parent by the 24-month review date in 10 weeks. The juvenile court then proceeded to find that return of the children to mother and father would create a substantial risk of detriment to the children, terminated mother and father's reunification services, and scheduled a section 366.26 hearing for September 6, 2022.

## DISCUSSION

### I. Finding of Detriment to Return

Father contends the evidence was insufficient to support the juvenile court's finding that return of the children to father would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. Father argues the finding was insufficient because father was able to parent the children during overnight visits, had several individuals in his support system that may have been able to provide childcare, and his current program allowed the children to be placed with him. Therefore, he contends, the juvenile court erred in not placing the children in his care. We disagree.

### A. *Legal Principles*

California's dependency system is designed to provide for the protection and safety of a minor who comes under the jurisdiction of the juvenile court and, when consistent with the minor's welfare, to preserve the minor's family ties. (§ 202, subd. (a).) At each dependency review hearing there is a statutory presumption that the child will be returned to parental custody. (§§ 366.21, subds. (e)(1) & (f)(1), 366.22,

15.

subd. (a).) Section 366.21, subdivision (f)(1) governs the 12-month review hearing and provides:

> "After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent … unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

"[T]he decision whether to return the child to parental custody depends on the effect the action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) While compliance with the reunification plan is a pertinent consideration, it is not conclusive evidence that a parent poses no risk of detriment to his or her child. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*).) The trial court must also determine whether the parent has the capacity to provide for the child's safety and well-being at the time of the review hearing. (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1140; *Joseph B.*, at p. 901.)

Section 366.21 "does not state or imply that, in order to keep a minor out of parental custody, the serious risk of detriment posed by returning the minor to his or her parent must involve the same type of harm which formed the basis for the dependency and the removal of the minor from parental custody." (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 898.) In determining whether there is a risk of detriment, the juvenile court considers factors, including, but not limited to:

> "[W]hether the natural parent maintains relationships with persons whose presence will be detrimental to the ward [citation]; instability in terms of

16.

management of a home [citation]; difficulties a minor has in dealing with others such as stepparents [citations]; limited awareness by a parent of the emotional and physical needs of a child [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and the manner in which the parent conducted himself or herself in relation to the minor in the past." (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)

**B.**     *Standard of Review*

We review a finding of detriment to determine whether the record is supported by substantial evidence. "In so doing, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the [juvenile court's] order." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1401.) We do not inquire whether the evidence supports a contrary finding but instead whether substantial evidence, contradicted or not, supports the finding actually made. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925.)

**C.**     *Analysis*

Father's insistence that his participation in overnight visits proves that he was able to care for the children without assistance fails to consider the many reports that he regularly left the young children and their infant sibling unattended during visits at the program. Furthermore, his argument that his potential childcare options and ability to reside at the drug program with the children had ameliorated any risk of detriment is an invitation to reweigh the evidence and give greater consideration to evidence that is unfavorable to the juvenile court's finding. We must "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) Even considering favorable evidence of the availability of babysitters and a place for father to reside with the children does not negate the significant evidence that father was not capable of providing for the children's safety and protection.

The juvenile court specifically identified father's inability to provide for the children on his own, which was readily supported by his very recent failure to manage the children during a two-hour supervised visit. A court may appropriately consider the

parent's past conduct as well as present circumstances. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Father's past conduct involved his failure to provide adequate supervision of his children of tender years with two of those children having special medical and developmental needs. Both instability in managing the children's home environment and limited awareness of the children's physical needs are relevant to a juvenile court's finding of detriment. (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)

A persistent lack of insight into father's codependent relationship with mother resulted in his unwillingness to accept the reality that he would need to be capable of caring for the children on his own. Although it is an unfortunate reality in dependency cases, parents of an intact relationship must be willing to prepare for the possibility that they will be the only parent available to obtain custody of their children. Father's failure to recognize this reality, and employ the parenting techniques he had been taught, provided ample reason for the juvenile court to decline returning the children to father's custody. On that evidence, the juvenile court could properly find that the children were exposed to a substantial risk of detriment if returned to father.

The children were removed from the custody of mother and father due to the unsafe environment of domestic violence and alcohol abuse. Throughout the case, father was described as struggling with the children and becoming frustrated when the children were in his care. Father did not appear interested in learning how to care for the children because he insisted that mother would be the children's primary care provider. Father demonstrated his ability to remain sober and complete his parenting, counseling, and domestic violence services. However, father continued to rely on mother and others to provide adequate supervision for his children during visits. Even after mother's relapse, father continued to insist that the children would be safe in their care. Father's failure to appreciate how mother's inability to maintain her sobriety affected her ability to be the primary care provider for the children further established an ongoing risk of detriment to the children.

18.

## II.    Finding of Reasonable Services

For the first time on appeal,[2] father argues that the agency failed to provide him reasonable services for the following reasons:  1) failing to arrange visits between father and the children without their infant sibling, 2) disregarding his attempt to secure housing, and 3) limiting father to supervised visitation after mother's relapse.

### A. *Legal Principles*

"Family reunification services play a critical role in dependency proceedings. [Citations.]  At the dispositional hearing, the court is required to order the agency to provide child welfare services to the child and his or her parents.  (§ 361.5, subd. (a).)  Services 'may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children.'  (§ 300.2.)  Reunification services should be tailored to the particular needs of the family."  (*In re M.F.* (2019) 32 Cal.App.5th 1, 13 (*M.F.*).)

At each review hearing, "[i]f the child is not returned to his or her parent …, the [juvenile] court [is required to] determine whether reasonable services that were designed to aid the parent … in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent."  (§§ 366.21, subds. (e)(8) & (f)(1)(A), 366.22, subd. (a)(1).)  "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the

---

**2**    We note that appellate courts have applied the waiver (forfeiture) doctrine in dependency proceedings in a variety of contexts in which the parent has failed to object, including situations in which the juvenile court has set a section 366.26 hearing after determining that reasonable services had been provided.  (*In re Kevin S.* (1996) 41 Cal.App.4th 882, 885−886.)  However, we decline to find that father forfeited the issue because he contested the agency's recommendation to terminate reunification services, which required the agency to prove that it provided reasonable services.  (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 ["when the merits of a case are contested, a parent is not required to object to the agency's failure to carry its burden of proof."].)

19.

circumstances of each case.' [Citation.] To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…' " (*M.F.*, *supra*, 32 Cal.App.5th at p. 14.)

At the 18-month review hearing, "the juvenile court may not set a section 366.26 hearing unless it finds by clear and convincing evidence that reasonable services were offered or provided to the parent." (*M.F.*, *supra*, 32 Cal.App.5th at p. 14.)

### B. *Standard of Review*

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all reasonable and legitimate inferences to uphold the judgment. [Citation.] 'If there is any substantial evidence to support the findings of a juvenile court, a reviewing court is without power to weigh or evaluate the findings.' " (*In re Ronell A. (*1996) 44 Cal.App.4th 1352, 1361–1362.)

### C. *Analysis*

Father complains that the agency failed to provide him reasonable services because it did not provide him with separate visits for the children and their infant sibling or secure him housing. Father also argues that the agency unreasonably limited him to supervised visitation when mother relapsed. If father was dissatisfied with his visitation arrangements, he was fully capable of advising his attorney of what was being required of him. Reunification is a collaborative effort and a parent is presumed capable of complying with a reasonable services plan. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 415.)

Consequently, the parent is responsible for communicating with the agency and participating in the reunification process. (*In re Raymond R.* (1994) 26 Cal.App.4th 436,

441.) If father felt during the reunification period that his visitation was inadequate, he " 'had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan.' " (*In re Christina L.*, *supra*, 3 Cal.App.4th at p. 416.) A parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)

Substantial evidence supports the juvenile court's finding that father was provided reasonable reunification services. Father's suggestion that the agency "disregarded" his efforts to obtain housing mischaracterizes the significant efforts that the agency and service providers made to assist the family in their efforts to obtain housing. The fact that father and mother did not find a house they liked despite assistance from an organization that was working with the parents to secure housing since November 2021, is reflective of the parents' lack of reasonable effort as opposed to the agency's.

Furthermore, after mother's relapse, monitored visitation was necessary due to father's inability to recognize the risk that mother's failure to maintain her sobriety posed to the children. Supervision was also justified by his own expression of hesitancy about being able to safely parent the children without mother. Indeed, the need for monitored visitation was well demonstrated after one of those visits had to be terminated for father's failure to manage the children and provide for their safety even with the assistance of multiple social workers. Father has failed to show the agency's implementation of his services plan and efforts to assist him in complying with it were unreasonable. Therefore, substantial evidence supports the juvenile court's finding he received reasonable reunification services.

**III.    Extension of Reunification Services**

Father's final contention is that the juvenile court erred by denying his request to extend his reunification services to the 24-month review period based upon section 366.22, subdivision (b).  We disagree.

**A.    *Legal Principles***

At the 18-month status review hearing, or permanency review hearing, the juvenile court must order the return of the child to the physical custody of the parent unless it finds the return would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  (§ 366.22, subd. (a)(1).)  If the child cannot be returned home, the court must order termination of reunification services to the parent and commence proceedings to implement a permanent plan for the child.  (§ 366.22, subd. (a)(3).)  The court may continue the case for up to six months if the child is not returned to the parent, provided the hearing occurs within 24 months of the date the child was originally taken from the physical custody of the parent if specific findings are made by the juvenile court.  (§ 366.22, subd. (b).)

 In order to continue reunification services past 18 months, the juvenile court must find by clear and convincing evidence that continuance and further reunification services are in the best interests of the child and the parent is, as relevant here, "[(1)] making significant and consistent progress in a court-ordered residential substance abuse treatment program … or … [(2)] recently discharged from incarceration … and making significant and consistent progress in establishing a safe home for the child's return." (§ 366.22, subd. (b).)  If the court makes the required findings by clear and convincing evidence, it "may continue the case for up to six months for a subsequent permanency review hearing, provided that the hearing shall occur within 24 months of the date the child was originally taken from the physical custody of his or her parent or guardian." (*Ibid.*)

22.

The court must also find "there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent." (§ 366.22, subd. (b).)

A finding of "a substantial probability that the child will be returned to the physical custody of his or her parent … and safely maintained in the home within the extended period of time," requires the court to find all of the following subfactors:

"(1) That the parent or legal guardian has consistently and regularly contacted and visited with the child[;]

"(2) That the parent or legal guardian has made significant and consistent progress in the prior 18 months in resolving problems that led to the child's removal from the home[; and]

"(3)(A) That the parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her substance abuse treatment plan as evidenced by reports from a substance abuse provider as applicable.…" (§ 366.22, subd. (b)(1)−(b)(3)(A).)

**B.    *Standard of Review***

On the issue of whether the juvenile court erred by failing to find a substantial probability of return existed, the question on appeal "becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4.) "Put another way, the issue is 'whether the evidence compels a finding in favor of [father] as a matter of law.' " (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966.)

**C.     *Analysis***

The juvenile court was required to make all of the findings delineated under section 366.22, subdivision (b) in order to justify extending father's reunification services. The juvenile court did not dispute that father had proven the first two prongs of regular visitation and consistent progress in a residential substance abuse treatment program. However, it was unable to find that the children were likely to be returned home in the 10 weeks before the end of a 24-month review period. In order to find a substantial probability of return, the juvenile court had to find that father "made significant and consistent progress in the prior 18 months in resolving problems that led to the [children's] removal from the home." (§ 366.22, subd. (b)(2).)

As we discussed above, father still lacked insight into the risk that mother's inability to maintain sobriety outside of a structured setting posed to the children. Over the past 20 months of reunification services father was provided with numerous services to enable him to safely parent the children on his own, but he failed to successfully utilize those skills when he was tasked with being the children's primary care provider. Father's contention that 10 weeks of visitation would have provided him with sufficient time to demonstrate his ability to provide for the children's safety is founded upon speculation and fails to account for father's past failures to provide adequate care. Therefore, we cannot say that the evidence on the issue was of such a character and weight to leave no room for the juvenile court to determine that it was insufficient to support a finding of a substantial probability of return by the 24-month review period.

In sum, we conclude the evidence cited by father did not compel the juvenile court to extend father's reunification services. For the reasons we have already stated, we find no error.

**DISPOSITION**

The petition for extraordinary writ is denied. The request for a stay of the section 366.26 hearing is also denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).